## CARTER OIL CO. v. ALEXANDER, Collector of Internal Revenue.

### No. 3211.

District Court, W. D. Oklahoma.

Oct. 7, 1930.

James A. Veasey, L. G. Owen, Walter Davison and Ford & Montgomery, all of Tulsa, Okl., for plaintiff.

Roy St. Lewis, U. S. Dist. Atty., of Oklahoma City, Okl., for defendant.

VAUGHT, District Judge.

The petition in this case, after alleging the jurisdictional facts, states:

That from November 1, 1919, to November 31, 1921, and for a number of years prior thereto, the plaintiff's sole business was the development of lands for oil and gas, and the sale of production therefrom in the state of Oklahoma and elsewhere. That it owned and operated certain leases producing oil in the Healdton and Hewitt districts in Carter county, Okl. That it never owned or operated a pipe line for the transportation of crude oil in the state of Oklahoma or elsewhere, nor has it ever engaged in the business of transporting crude oil by pipe line or otherwise. That prior to said month of November, 1919, the plaintiff acquired the fee title to several tracts of land not within the producing regions of Carter county, Okl., but convenient to said region, and erected thereon a large number of steel storage tanks of 37,500 and 55,000 barrels capacity, each, to be utilized in the storing of plaintiff's excess production from said districts, or to store plaintiff's production when it was desirous of obtaining a higher market price for the same at some future time. That said tanks were located from four to twelve miles distant from plaintiff's producing leases, and long prior to November, 1919, the plaintiff had connected said producing leases with steel tanks by a series of small service lines either two, three, or four inches in diameter. That the function of said facilities was to enable the plaintiff to store all or part of its production in that vicinity. That in the interval between November 1, 1919, and August 31, 1921, the plaintiff stored 1,626,963.99 barrels of crude oil produced by it from said districts, through said small service lines owned by it as aforesaid. That in like manner during the four months succeeding August 31, 1921, additional quantities of crude oil produced and belonging to plaintiff were run through said small lines into plaintiff's storage, to wit: September, 1921, 328,104.49 barrels; October, 1921, 122,430.71; November, 1921, 114,280.47 barrels; December, 1921, 70,763.92 barrels. That all of said oil was run into storage either because the pipe line service in said field was temporarily inadequate or because plaintiff desired to store a part of said production for a better market price.

That at no time during the period beginning November 1, 1919, and ending December 31, 1921, nor at any other time, did plaintiff use said facilities for the running, movement, or storage of crude oil belonging to another person or persons. That said storage tanks were not located at or near an oil refinery, nor at or near a center of petroleum consumption. That plaintiff's reasons for building said tanks from four to twelve miles distant from its producing properties was to reduce the hazard of fire which would have been accentuated by the storing of large quantities of crude oil in the immediate vicinity of the producing and operated oil property, and for the further reason that the construction of tanks of the size mentioned surrounded by the necessary fire walls to protect the tanks from destruction would have seriously interfered with the operation of any oil property on which the same might have been located, and thus would have prevented the development of the oil producing properties occupied by said storage. That during said time pipe line companies operating in said fields performed the following service: They connected their relatively small lateral lines with the producing properties in

those districts, or with the steel tanks containing crude oil held in storage located there, and thereupon moved such oil to their nearest receiving station on their main trunk line, and this service was referred to, and known in the business as, the "gathering of oil." That, following this operation, the oil was conveyed through their tank line or lines to the point of destination, and this act was referred to and known in the business as the "transportation of oil." That in February, 1922, the Commissioner of Internal Revenue found that the movement of oil from the producing field to the storage tanks constituted transportation of oil under the Federal Revenue Act of 1918, and upon such finding made the following assessments against the plaintiff on account of said alleged transportation of crude oil, to wit: For the period beginning November 1, 1919, and ending August 31, 1921, $13,015.73; during the month of September, 1921, $2,624.84; October 1921, $979.45; November 4th, $924.24; December 1921, $556.11, and thereafter, the Commission, on October 5, 1922, increased the "gathering rate," held the basis for said assessment, from ten cents per barrel to twelve cents per barrel, and in other respects modified and adjusted the assessment or assessments made against plaintiff on account of said movements. That, as a result of said several assessments, notice and demand for the payment of the following taxes was made upon the plaintiff by the defendant, to wit: $13,015.73, $2,624.84, $979.45, $914.24, $2,984.56, plus a penalty of $149.23, making a total tax of $20,668.05. That immediately following such notice and demand plaintiff filed proper claims for abatement, alleging that said assessments, and all of them, were illegal and erroneous and setting forth the reasons therefor. That all of said claims for abatement were by the Commissioner of Internal Revenue rejected.

That on the 27th day of March, 1923, a further notice and demand for the payment of said taxes were made upon plaintiff by the defendant, and that the plaintiff was forced to and did pay the sum of $20,668.05 under protest, said payments being made on different dates from the 31st day of March 1923 to the 5th of December, 1923, and that upon the payment of said sum under protest the plaintiff filed with the Commissioner of Internal Revenue proper claims for refund with respect to each item of said tax, alleging the illegality of said assessments, and each of them; that, while said claims for refund were pending, the Commissioner of Internal Revenue rebated to the plaintiff $4,518.53, leaving as a balance the total tax of $16,149.52, illegally and erroneously assessed and collected from the plaintiff, wherefore the plaintiff prays judgment against the defendant for the sum of $16,149.52, with interest at the legal rate from the date of the collection of said items of tax, and for costs.

The defendant has filed its answer denying the material allegations alleged in the petition, and prays that the plaintiff take nothing and that the defendant recover his costs.

The parties to this action have filed a stipulation expressly waiving a jury, and, after the introduction of evidence and the arguments of counsel, the defendant moves for judgment.

There is little or no conflict in the evidence in this case, but in the judgment of the court it is purely a question of law, and there is involved only the construction of certain parts of the Revenue Act of 1918, 40 Stat. at Large, 1057, 1101, 1102, 1103 (amendatory of the Revenue Act of 1917 [40 Stat. 314], entitled, "War Tax on Facilities Furnished by Public Utilities, and Insurance"), under which the tax complained of was levied and collected. Section 500 of said act provides: "Sec. 500. That from and after April 1, 1919, there shall be levied, assessed, collected, and paid, in lieu of the taxes imposed by section 500 of the Revenue Act of 1917—"

Subdivision (a) provides for a tax of 3 per centum on the amount paid for freight shipments.

Subdivision (b) provides a per centum tax on amount paid for express shipments.

Subdivision (c) provides for a tax of 8 per centum on the amount paid for transportation of persons.

Subdivision (d) provides for a tax of 8 per centum on the amount paid for parlor car seats and sleeping car berths.

Subdivision (e) provides a tax equivalent to 8 per centum of the amount paid for the transportation on or after such date (April 1, 1919) of oil by pipe line.

Subdivision (f) provides for a tax on telegraph, telephone, cable, or radio dispatch, message, or conversation.

Subdivision (g) provides for a tax on telephone and telegraph companies.

Section 501 (a) provides that the taxes imposed by section 500 shall be paid by the person paying for the services or facilities rendered.

Subdivisions (c) and (d) of section 501 provides as follows:

"(c) The taxes imposed by section 500

shall apply to all services or facilities specified in such section when rendered for hire, whether or not the agency rendering them is a common carrier. In case a carrier (other than a pipe line) principally engaged in rendering transportation services or facilities for hire does not, because of its ownership of the goods transported, or for any other reason, receive the amount which as a carrier it would otherwise charge, such carrier shall pay a tax equivalent to the tax which would be imposed upon the transportation of such goods if the carrier received payment for such transportation, such tax, if it can not be computed from actual rates or tariffs of the carrier, to be computed on the basis of the rates or tariffs of other carriers for like services as determined by the Commissioner. In the case of any carrier (other than a pipe line) the principal business of which is to transport goods belonging to it on its own account and which only incidentally renders services for hire, the tax shall apply to such services or facilities only as are actually rendered by it for hire. Nothing in this or the preceding section shall be construed as imposing a tax (1) upon the transportation of any commodity which is necessary for the use of the carrier in the conduct of its business as such and is intended to be so used or has been so used; or (2) upon the transportation of company material transported by one carrier, which constitutes a part of a railroad system, for another carrier which is also a part of the same system.

"(d) The tax imposed by subdivision (e) of section 500 shall apply to all transportation of oil by pipe line. In case no charge for transportation is made, by reason of ownership of the commodity transported, or for any other reason, the person transporting by pipe line shall pay a tax equivalent to the tax which would be imposed if such person received payment for such transportation, and if the tax can not be computed from actual bona fide rates or tariffs, it shall be computed (1) on the basis of the rates or tariffs of other pipe lines for like services, as determined by the Commissioner, or (2) if no such rates or tariffs exist, on the basis of a reasonable charge for such transportation, as determined by the Commissioner."

The construction, therefore, of subdivision (e), section 500, is necessary in order to determine the issues in this case.

What is meant by transportation of oil by pipe lines? Counsel for plaintiff quote 23 Treasury decision page 745, No. 3197, dated July 18, 1921, which is as follows:

"Where the person so transporting is not a carrier, there is a taxable transportation of oil by pipe line within the meaning of section 501 (d), whenever the movement of said oil, affected by the owner thereof, is substantially similar to those movements which pipe line carriers usually undertake and perform; or, in other words, where the movement is not merely local and incidental to another business engaged in by the person so transporting, such as the producing or refining of oil. Thus where a refiner maintains a main, trunk, or stem line from his refinery to an oil field or pool, the services he performs for himself are similar to those which pipe line carriers would otherwise render to him. He should, therefore, pay the tax as though he had in fact employed the services of a carrier. If, on the other hand, the movement is from storage tanks to stills, which are a part of the same manufacturing unit, or from wells to flow tanks or storage tanks situate in the immediate vicinity, the movement is not such as a pipe line carrier of oil would normally render, and consequently should not be taxed.

"[Sgd] D. H. Blair, Commissioner of Internal Revenue.
"Approved July 18, 1921:
"A. W. Mellon, Secretary of the Treasury."

It is clear that Congress had in mind, at the time that section 500 was enacted, the taxation of transportation facilities. The evidence in this case disclosed that there are main pipe lines running from various oil fields to central markets, some of them hundreds of miles in length. These are recognized as public utilities the same as other common carriers. There are also branch pipe lines which connect various oil fields or storage farms with the main trunk pipe line. Then there are smaller pipe lines connecting the branch lines with various wells or producing fields known as gathering lines, and we might define the pipe lines as being the main trunk line, the branch lines, and the gathering lines. The facts in this case are undisputed that the plaintiff was operating certain leases in the Healdton and Hewitt fields. It had numerous producing wells thereon, but, in order to conserve its oil and provide storage therefor which would enable it to produce oil in excess of the amount which would be taken from its wells by the pipe line, or for the purpose of holding for a higher price, provided within four to twelve miles of the field its own tank farm on which it erected a number of tanks of 37,500 and 55,000 barrel capacity. There is no contention that the

plaintiff utilized these tanks for any purpose except to store its own oil, and that these tanks were connected with the main trunk pipe line, first, by gathering lines which emptied into the branch lines, and the branch line into the main trunk line.

Was the carriage of the oil from the wells of the plaintiff to its own storage tanks transportation of oil as. contemplated by Congress in the act of 1918? Is there a distinction between the transportation of oil and conservation of oil? If a producer has a storage tank within a hundred yards or a hundred feet of his well, would it be contended that taking his oil from the well would be transportation in the sense intended in the act, or would it merely be a part of the necessary acts in producing the oil, and, if the storage tanks were located because of fire hazards and convenience, a number of miles away from the wells, would that change the production and conservation of oil to transportation of oil? The Treasury decision, No. 3197, supra, in the last sentence says: "If, on the other hand, the movement is from storage tanks to stills, which are a part of the same manufacturing unit, or from wells to flow tanks or storage tanks situate in the immediate vicinity, the movement is not such as a pipe line carrier of oil would normally render, and consequently should not be taxed."

Attorneys for the defendant contend that the carrying of oil from the well to the storage tank, regardless of the distance, would be transportation, and have cited numerous cases.

In Motter v. Derby Oil Company (C. C. A.) 16 F.(2d) 717, the facts were that the Derby Oil Company operated and maintained a refinery in Wichita, Kan. They also owned producing properties in Butler county, and operated and controlled two and three inch pipe lines connecting the greater part of its production with its refinery at Wichita, Kan. The Circuit Court of Appeals held that this was transportation, and I thoroughly agree with that honorable court, because it would be immaterial whether the oil was transported to a refinery or to a market, and, if the transportation of the oil to a refinery or to a loading tank or to a main pipe line was the first step in the removal of the oil from the producing field to the market or to the refinery, it would certainly be transportation. Both plaintiff and defendant cite the case of Dixie Oil Company v. United States (C. C. A.) 24 F.(2d) 804, 805. In this case the Dixie Oil Company had a producing lease approximately one mile and a half from the main line of the Texas & Pacific Railway Company. On the western part of the lease was located a battery of settling tanks. Near the eastern line of that lease there was a 55,000 barrel tank used for storage purposes. The company owned and operated the pipe line connecting the tanks on its lease with a loading rack on the Texas & Pacific Railway. The loading rack was also owned by the company. The oil produced was pumped from the wells into the tanks, and from the tanks transported to the loading rack, and from the loading rack into tank cars. If no tank cars were available, the oil was stored in the storage tanks near the eastern boundary of the lease, and, when the tank cars were available, the oil was pumped from the storage tanks to the loading rack. The trial court [23 F.(2d) 888] in that case held that the movement of the oil by the Dixie Company from its lease to the loading rack was a taxable transportation as meant and intended by the Revenue Act of 1918, and the case was affirmed. The appellate court, in affirming the case, said: "The production of the oil, the extraction of it from beneath the earth's surface, and the preparation of it for transportation, by depositing it in settling or storage tanks, were completed before the movement of it from plaintiff's lease began. The oil's journey to its destination had begun when it left plaintiff's premises, though that journey was interrupted by putting the oil in the loading rack. The movement of the oil from plaintiff's lease preparatory to its being loaded into tank cars was as much transportation of it by pipe line as it would have been if the distance covered had greatly exceeded a mile and a half."

The opinion in this case is not inconsistent with the holding of the Eighth Circuit Court of Appeals in the Derby Oil Company Case, supra. Nor, in the opinion of the court, is either of these cases applicable to the case at bar. The plaintiff, it is true, stored his oil in his tanks by means of a pipe line, or rather a line of pipe, but pipe line as contemplated in this act carries with it the act of transportation. It is the public utility feature, and, in the judgment of the court, it was used in that connection with the idea of being a public utility. Now the plaintiff in this case found it necessary to transport its oil from the the storage tanks by means of gathering lines or branch lines to the main trunk pipe line. In other words, the transportation of its oil had never begun. The use

of the storage tanks in this case was more a means of conserving the oil and preparing it for transportation then for transportation itself. The court finds no fault with the authorities cited by the defendant, but does not agree to their application to the case at bar. The farmer gathers his corn in the field, and conveys it by a wagon to his granary, or he conveys his wheat from the field to the bin, and, while this is actually transportation in one sense, it certainly is not transportation with reference to marketing his grain, and it is apparent to the court that Congress had in mind that, whenever the movement of oil began from the possession of the producer to the market or to a refinery, then transportation as intended by this act began, but not before. What would the producer do with his oil if the pipe line could not carry the oil produced, and he had no place to store it? Must he shut down his wells? Is the government prejudiced in any way by him storing his oil? Is the transportation interfered with, or is the tax which the government provides must be levied upon transportation, whether it be by gathering the oil in the field or by conveying it by branch pipe lines to the main trunk line, in any wise lessened. I think not. The government receives the same tax that it would have received had this oil been taken directly from the well by means of a gathering line to the pipe line proper or to the loading rack or to the refinery. I am not of the opinion that every line of pipe is a pipe line as intended by this act. An oil field is filled with pipes, and the oil is taken from the well in pipes, but it certainly would not be contended by the government that that is a pipe line as contemplated by this act, which has reference to a common carrier. If, therefore, the pipe line connecting the well to the storage tank was not a public utility, and did not perform the function ordinarily performed by other pipe lines in the vicinity, but was merely a means for producing and conserving the oil by the owner of the lease, and was not such a pipe line as is contemplated under subdivision (e), § 500, of the Revenue Act of 1918, then the Commissioner had no power to assess a tax against the plaintiff for the transportation of its oil from the wells to the storage or settling tanks.

Judgment is therefore rendered in favor of the plaintiff and against the defendant in the sum of $16,149.52, with interest thereon at the rate of 6 per cent. from the 5th day of December, 1923, until paid. Exception is allowed defendant.