JONES, Collector, v. CONTINENTAL OIL CO.

No. 2832.

Circuit Court of Appeals, Tenth Circuit.

March 21, 1944.

Louise Foster, of Washington, D.C. (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, Robert N. Anderson, and Courtnay C. Hamilton, Sp. Assts. to the Atty. Gen., and Charles E. Dierker, U. S. Atty., of Oklahoma City, Okl., on the brief), for appellant.

A. L. Hull, of Ponca City, Okl., for appellee.

Before PHILLIPS, BRATTON, and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

The appellee, Continental Oil Company, sued and recovered a judgment against the United States for excise taxes assessed and collected on the movement of crude oil by pipe-line under the provisions of Section 731 of the Revenue Act of 1932, 47 Stat. 169, 26 U.S.C.A. Int.Rev.Acts, page 636, which imposes a tax equivalent to 4% of the amount paid for all transportation of crude petroleum or the liquid products thereof by pipe-line; provided that if no charge is made, either by reason of the ownership of the commodity transported, or for any other reason, a tax equivalent to 4% of the fair charge is imposed.[1] Although the parties

---

[1] "Sec. 731. Tax on Transportation of Oil by Pipe Line

"(a) There is hereby imposed upon all transportation of crude petroleum and liquid products thereof by pipe line * * *

"(1) A tax equivalent to 4 per centum of the amount paid on or after the fifteenth day after the date of the enactment of this Act for such transportation, to be paid by the person furnishing such transportation.

"(2) In case no charge for transportation is made, either by reason of ownership of the commodity transported or for any other reason, a tax equivalent to 4 per centum of the fair charge for such transportation, to be paid by the person furnishing such transportation."

do not agree upon the particular movement involved, and on which the tax is based, the primary facts are not in dispute.

The taxpayer is an integrated oil company with separate and distinct divisions or departments devoted to the production, transportation, refining and marketing of crude oil and its products. As a part of its holdings, it owned and operated a number of producing oil leases in two Louisiana oil fields known as the Ville Platte and Tepetate Fields. The wells in each field produced high gravity oil at high pressures containing a large volume of gases in solution, and a large volume of free gas not in solution. Prior to July, 1936, the wells were produced by the usual and conventional method, that is, the fluid in mixture flowed at high pressure through a small choke at the mouth of the well and into a separator where some of the lighter gases were vented off, thence to the flow or settling tanks nearby where the water and basic sediment settled to the bottom, and the crude then drained off the top into stock tanks on the lease. At this point, the crude was measured for royalty purposes and delivered to the pipe-line department for transportation to market. While undergoing the necessary settling and weathering process in the preparation for marketing, large volumes of valuable hydrocarbon gasses in solution were lost by evaporation under atmospheric pressure.

In order to save and conserve these highly valuable hydrocarbon gases, for which there was a great demand in the manufacture of high octane gasoline, the taxpayer devised a method commonly known as "field stabilization" of well fluids, which it installed in both the Ville Platte and Tepetate Fields. Stabilization plants were constructed in the geometrical center of each field, the farthest well being approximately one and one-half miles from the respective plants. Under this method, the production from the wells flowed directly from the well mouth, without interruption, to separators adjacent to the plant, where the lighter dry or non-condensable gasses were removed, saved, and returned to the producing formation. The fluid then passed from the separator through a meter into the stabilization or treating plant, where it was further denuded of hydrocarbon or liquefied gasses which ordinarily escaped by evaporation under the conventional method. After the hydrocarbon gasses were removed and saved, and the

fluid subjected to a desalting process, it passed through a master meter, at which point it was measured for royalty purposes, and delivered to the pipe-line department as merchantable oil. It continued, however, to flow under its original well pressure through a pipe-line approximately 100 yards to an 80,000 barrel storage tank located on the trunk line leading to the Lake Charles Terminal. In other words, the flowage from the well mouth, through the separator, stabilization plant, master meter, and into the storage tank, was one continuous movement under the original bottom hole pressure.

In respect to the Ville Platte Field, other oil purchased by the pipe-line department from leases not owned or operated by the taxpayer, entered the pipe-line at a point between the master meter behind the plant, and the storage tank, and there became commingled with the taxpayer's oil. This oil had been subjected to the conventional weathering process in the flow and stock tanks of the producers, was delivered to the pipe-line department at the stock tanks on the respective leases, and by an admitted taxable gathering movement transported by pipe-line to the 80,000 barrel storage tank. The tax on this movement, as well as the trunk line tax from the storage tanks to the Lake Charles Terminal, has been paid and is not involved here.

The protested tax was assessed and collected on the theory that a taxable "gathering" of crude oil had been effected in the movement of the oil from the taxpayer's leases in the Ville Platte, and Tepetate Fields, but the assessment is not of record and there is nothing to indicate on what particular movement the assessment was based. According to the claim for refund, and the complaint, the assessment was based upon the movement of the crude oil from the well mouth to the stabilization plant, where the oil was measured for royalty purposes and delivered to the pipe-line department. By answer, the Collector specifically denied that the tax was based upon the movement of oil from the well mouth to the plant, and affirmatively alleged that the taxable movement was from the wells to the storage tank on the main line.

The pretrial proceedings clearly indicate that the parties intended to define and restrict the issues to the narrow question whether the movement of oil from the

well mouth to the stabilization plant constituted a taxable "gathering" under the Act,[2] but when the matter came on for hearing before the special master, counsel for the Collector reasserted its contention as pleaded to the effect that the "taxable gathering movement extended from the mouth of the well to the storage tanks at the main line, where the main line accepted the oil," and the taxpayer replied that if this be correct, such movement "would still be a part of production and not a taxable movement under the law."

The trial court recognized and treated the divergent contentions of the taxpayer and Collector, and found as a fact that neither the movement of the oil from the well mouth to the stabilization plant, nor from the stabilization plant to the storage tank, when considered separately or as one continuous, uninterrupted movement, was such as a pipe-line carrier would ordinarily or usually undertake and perform. The court regarded such movement "as a part of and incidental to the production of oil," differing only in size and degree from the ordinary and conventional method of preparing the production for market, which the taxpayer employed prior to the installation of the stabilization equipment. Based on this finding, the court held that the movement of the oil from the wells to the storage tank was part of the production process, and not a taxable gathering movement within the meaning of the taxing statute.

On appeal, the appellant treats the question as if only the movement from the stabilization plant to the storage tank was involved, while the appellee proceeds on the postulate that only the movement from the wells to the stabilization plant is involved—neither party meets the true issue raised by the pleadings and decided by the trial court—whether the continuous and uninterrupted movement from the well mouth through all of the stabilization equipment to the storage tanks constituted a taxable gathering under the Act.

■ The test to be applied in the determination of the taxability is not in dispute. The tax is " * * * imposed upon all transportation of crude petroleum * * * by pipe-line." Treasury Regulations 42, Article 26, defines "all transportation by pipe-line" as including transportation by a private owner whenever the movement is substantially similar to movements which pipe-line carriers usually undertake and perform, if such movement is not merely local or incidental to the business of producing or refining oil. That if the movement is from wells to flow or storage tanks situated in the immediate vicinity, the movement is not such as a pipe-line carrier would normally render, and consequently is not subject to the tax, but the movement by pipe-line from the lease storage tanks to storage tanks usually maintained at receiving stations on the end of a "stem" or gathering line, is subject to the tax. See also Treasury Decision 3197, July 18, 1921. The Congress has impliedly approved this administrative definition and interpretation of the Act by repeated reenactments without material change (see

[2] At the pretrial conference, the following colloquy occurred:

Mr. Hull for taxpayer: " * * * Now the tax was laid on the theory that the movement from the well mouth to the stabilization plant and the separators there, was a gathering movement. As I understand from talking to Mr. Dierker's office that is the sole question in the case, as to whether that is a gathering, within the regulations and returns of the taxing statute. * * * It is just that movement from the well mouth into the plant that is the subject of this tax * * *."

The Court: "Is there any reason why the auditors can't get together and make the figures without having to submit it?"

Mr. Hull: "That's right, after you pass on the main law proposition as to whether it is a taxable movement."

Mr. Dierker for the Collector: "I think that's right; that is the only issue."

The Court: "Let the record show all the allegations in the petition are admitted except the matter of auditing."

Mr. Dierker: "That is correct."

The Court: "And that presents the law question."

Mr. Dierker: "That's right."

The Court: "That is all you need, is the stipulation of fact."

Mr. Dierker: "Well, of course there may be some proof as to whether or not this constitutes a processing or a controlled weathering."

The Court: "Let the record further show that such agreement of counsel does not decide the issue of fact as to whether or not it is a gathering process, but additional testimony may be heard as to that, and it is not intended by this agreement to stipulate as to that fact, so that will save you as to that if you need any expert testimony."

historical note 26 U.S.C.A. Int.Rev.Code, § 3460), and the courts have, without deviation, adopted and applied this practical test under varied circumstances. Motter v. Derby Oil Co., 8 Cir., 16 F.2d 717; Dixie Oil Co. v. United States, 5 Cir., 24 F.2d 804; Alexander v. Carter Oil Co., 10 Cir., 53 F.2d 964; McKeever v. Fontenot, 5 Cir., 104 F.2d 326, certiorari denied 308 U.S. 588, 60 S.Ct. 113, 84 L.Ed. 492; Alexander v. Cosden, 290 U.S. 484, 492, 54 S.Ct. 292, 78 L.Ed. 452; Mohawk Petroleum Co. v. Lewis, D.C., 19 F.Supp. 867; Big Lake Oil Co. v. Driscoll, D.C., 40 F.Supp. 510; Caminol Co. v. United States, D.C., 41 F. Supp. 819.

In Alexander v. Carter Oil Co., supra, the trial court found and concluded that a movement of oil from the flow or settling tank at the well to storage tanks four to twelve miles distant, where it was measured for royalty purposes and delivered to the pipe-line carrier, was under the peculiar circumstances, a part of the production process and not a movement or substantially similar to a movement which a pipe-line carrier would ordinarily and usually undertake and perform. D.C., 50 F.2d 214. This court held that the question was one primarily of fact, and that the judgment of the trial court holding the movement nontaxable was warranted by the evidence. In Big Lake Oil Co. v. Driscoll, supra, the question before the District Court was whether the movement of oil from the flow or settling tanks to the treating plant, and thence to storage tanks in the immediate vicinity where it was measured and delivered to the pipe-line carrier as merchantable oil, was a taxable transportation of oil by pipe-line as contemplated by the statute, and the court held under the attendant facts that such movement was merely incidental to production, and was not one which a pipeline carrier would ordinarily undertake and perform.

But in McKeever v. Fontenot, supra, the appellate court, in sustaining the findings and conclusions of the trial court, held that the movement of finished petroleum products from storage tanks at the refinery to the loading wharf 3,600 to 5,500 feet distant, was a function which a pipe-line carrier would ordinarily perform, and was therefore a taxable transportation within the meaning of the Act. In Mohawk Petroleum Co. v. Lewis, supra, the taxpayer owned and operated a producing oil lease, and it also owned and operated a refinery immediately adjoining the lease. The oil was first run into flow tanks near the respective wells, and there measured for royalty purposes. It then moved through a pipe-line one-quarter to one-half mile to storage tanks located between the lease and the refinery, where it was there stored as crude stock for the refinery. The court held that the movement of the oil from the flow tanks at the well to the storage tanks was not a part of or incidental to production, but was a pipe-line transportation and taxable as such. However, it held that the movement of the oil from the storage tank into the refinery was incidental to the refinery business, and not a taxable movement. Cf. Dixie Oil Co. v. United States, supra.

The test is simple and practical, the difficulty lies in its application to the particular problems as they arise from the actual production, transportation, and refining of petroleum products. The question when production ceases and transportation commences is one which necessarily lies within the peculiar province of the trier of the facts, having regard for the practicalities of the problems involved. The trial court has found and concluded that the movement of oil from the wells through the treating equipment into the storage tanks, when considered as one continuous and uninterrupted movement, was in reality a part of the production process, and was not similar to a movement which a pipe-line carrier would ordinarily undertake and perform. This is the particular movement on which the Collector sought to base and sustain the tax, and we are of the opinion that the judgment of the trial court is warranted by the record, and is not clearly erroneous. On appeal, the Collector does not challenge the judgment of the court based upon this premise, rather he seeks to confine the issue to the movement of the oil from the treating plant to the storage tanks on the main line. But that particular question is not before us, and we do not decide it, since according to the record the tax was not based upon this particular movement of oil; the judgment of the trial court does not rest thereon and the Collector cannot now shift the basis for the exaction of the tax in order to sustain his theory on appeal.

The judgment is affirmed.