**CONTINENTAL OIL CO. v. JONES,**
Collector of Internal Revenue.
Civ. A. No. 3859.

United States District Court
W. D. Oklahoma.
Sept. 22, 1948.

A. L. Hull, of Ponca City, Okl., for plaintiff.

Robert E. Shelton, U. S. Atty., of Oklahoma City, Okl., and Courtnay C. Hamilton, Sp. Asst. to the Atty. Gen., for defendant.

BROADDUS, District Judge.

*Parties and Jurisdiction*

1. The Continental Oil Company, a Delaware corporation, brings this action against H. C. Jones, a resident of the Western District of Oklahoma, as Collector of Internal Revenue within Oklahoma, for refund of taxes assessed under the provisions of 26 U.S.C.A. § 3460, and paid by the plaintiff corporation. This court has jurisdiction. 28 U.S.C.A. § 41(1), (5).[1]

*The Taxed Pipe Line Movement*

2. Continental owns and operates certain oil properties in the Ville Platte and Tepetate oil fields of Louisiana. In the year 1936, in the course of development of these properties, a stabilization plant was put into operation for each of the fields to process the oil as it came from Continental's wells so as to save valuable gases and highly volatile liquids from the oil wells theretofore wasted; and also to bring the oil to the required standard for acceptance by the pipe line carrier. The properties were operated and the oil processed for the years involved in this action, that is from 1942 to 1946.

---

[1] In 1948 Revision, 28 U.S.C.A. § 1331 et seq.

The stablilization plants replaced the system formerly in use, which consisted of a series of settling tanks at the various leases, and a gathering pipe line network to transport the oil to the main pipe line running to Lake Charles, Louisiana. The plant of each of the properties was situated in about the center of Continental's production in the respective fields, the Ville Platte Plant serving 159 wells, and the Tepetate Plant serving 44 wells. By well pressure, the oil was forced through the collecting pipe lines to the plants, and was properly metered to allow the application of an appropriate ratio to each lease for royalty purposes, the final measurement of the processed oil being at the master meter just as the oil left the plant. The movement of the oil in the stabilization process was by the pressure from the wells, with the exception of one step in the operation where it was necessary to reduce the pressure and thereafter increase it by booster pumps to continue the flow. Under pressure, it left the plant after the final meter measurement, and emptied into a battery of large storage tanks of 80,000 barrel capacity located from 700 to 950 feet from the master meter.

In these tanks the pressure became reduced to atmospheric pressure. While some slight weathering process and some cooling took place there the primary purpose of the tanks was to store the oil from the properties until a convenient time for transportation by the pipe line carrier.

Continental purchased crude oil of pipe line grade from other producing leases in the area, not owned by it. This oil was transported by a network of gathering pipe lines to a point where it joined the line from the plant to the storage tanks, a few feet from the tanks themselves. Most or all of the purchased oil had been subjected to the old fashioned weathering process in settling tanks at the respective leases.

When this commingled oil was needed, it was allowed to flow by atmospheric pressure from the storage tanks through a pipe line from 800 to 1200 feet in length to the pump connecting the storage tanks with the main pipe line for transportation to the market.

None of the equipment and pipe lines through which the oil flows after passing through the master meter at the end of the stabilization process is operated by and under the control of the pipe line division, a separate department of Continental set up to carry on that portion of its activities until the oil is turned over to it in the 80,000 barrel tanks at Tepetate and Ville Platte, respectively."

3. Continental's tariff rates on file with the Interstate Commerce Commission show the tariff for the transportation of oil by pipe line from the Ville Platte and Tepetate fields to Lake Charles, and for the gathering service performed in transporting outside purchases of crude oil from the lease tanks to the point where such pipe line joined the line from the stabilization plant to the storage tanks. Taxes were paid on such movements of oil, and are not in question here.

4. The oil was not of such quality as to be accepted ordinarily by a pipe line carrier until it left the stabilization plant on its way to the storage tanks. The evidence shows that the oil would not be accepted by a pipe line until it left the storage tanks, but the evidence further shows that the only reason the oil would not be accepted as it left the stabilization plant was that it was not customary for pipe line carriers to accept oil under other than atmospheric pressure.

5. A tax is imposed by the provisions of 26 U.S.C.A. § 3460 upon all transportation of crude petroleum by pipe line equivalent to 4½ per cent of the amount paid for such transportation, to be paid by the person furnishing it, and in case no charge is made therefor for any reason, the tax shall be equivalent to 4½ per cent of the fair charge therefor. Under this statute and upon the theory that the tax is laid either upon the movement of the oil from the plants to the respective storage tanks, or from the storage tanks to the pumps which pump the oil into the main pipe line, the Commissioner of Internal Revenue assessed a tax of $4,644.88 on the gathering of oil by Continental from its leases in the Ville Platte and Tepetate fields and its transportation through the treating plant and the storage tanks to the pipe line, for

the period of July 1, 1942, to April 30, 1943, and an additional tax of $14,895.40 for like transportation for the period from May 1, 1943, to August 31, 1946, which sums were paid by Continental. Proper claims were filed for refund, none of which was allowed by the Commissioner. Continental brings this action for a refund of the amounts paid, with interest.

### The Prior Action and Changes in Applicable Regulations

6. An action was brought by the plaintiff herein against the defendant to recover taxes assessed by the Commissioner for a period prior to those involved herein on the transportation of oil from the wells through the stabilization plant to the storage tanks. Upon trial before a special master, the master found that neither the movement from the wells to the stabilization plant, nor that from the plant to the storage tanks was a taxable movement, both being a part of and incident to the production of the oil, which findings were approved. Upon appeal to the Circuit Court of Appeals for the 10th Circuit, that court upheld the decision that the uninterrupted flow of oil from the wells through the stabilization plant to the storage tanks was a mere incident to production, and refused to pass on the more restricted question of whether the movement from the plant to the storage tanks alone was a taxable transfer, holding that such question was not before the lower court. Jones, Collector, v. Continental Oil Co., 10 Cir., 141 F.2d 923, 926.

7. When the previous case was decided, the applicable regulations of the Treasury Department were those contained in 26 Code of Federal Regulations, Sec. 130.26, which defined transportation as including transportation by a public or private carrier, whether or not for hire, and also such movement by a private owner as is substantially similar to movements which pipe line carriers usually undertake and perform, and is not merely local or incidental to a related business such as producing or refining. "Thus, where a refiner maintains a trunk line or a gathering line from a refinery to an oil field or pool, the services which the refiner performs for himself are similar to those which pipe line carriers

would otherwise render. * * * If, on the other hand, the movement is from storage tanks to stills which are a part of the same manufacturing unit, or from wells to flow tanks situated in the immediate vicinity, the movement is not such as a pipe line carrier would normally render and consequently is not subject to the tax. * * * The gathering service rendered in movements from lease storage tanks to storage tanks or receiving stations at the end of a stem, or gathering line, is subject to tax."

Since the prior holding Regulations 42, 1942 Edition (7 F.R. 2559), 26 Code of Federal Regulations Cumulative Supplement, Sections 130.21 and 130.22, effective March 31, 1942, has changed the regulation and interpretation of transportation, that is such as may be substantially similar to movements which pipe lines usually undertake and perform, by omitting such term altogether from the regulations and in lieu thereof defining the taxable movement to include gathering service within the producing field or area and loading service furnished as a part of, or in connection with, a transportation service; and defining gathering service to include the movement of the oil through any pipe line reaching from wells, flow tanks, or settling tanks in the area of the field where the product is produced, to storage tanks, a trunk line or a main line, a refinery, or to a market, or any other point within the producing area, without regard to the size of the pipe, the length of the movement or the quantity of the product. Excepted therefrom is movement from wells to flow tanks, or settling tanks adjacent to the wells.

### Conclusions of law

A. The doctrine of res adjudicata applies only to tax proceedings involving the same claim and the same tax period, whereas the doctrine of collateral estoppel, or estoppel by judgment, applies to tax proceedings involving similar claims containing the same legal points, or different tax years, when there has been no change in the controlling facts or applicable legal principles. Commissioner v. Sunnen, 333 U.S. 591, 68 S.Ct. 715. The consideration of a different tax period, the material change of the applicable tax regulations, and the limitation and difference in the oil

movement prevent the operation of the doctrine of res adjudicata or of estoppel by judgment.

▮ B. A regulation, promulgated by a department of the government pursuant to statutory authority, has the force and effect of law unless it is in conflict with an express statutory provision; and when the regulation is a contemporary construction of the act authorizing it, the construction is entitled to consideration and will not be set aside except for weighty reasons. United States v. Public Service Co. of Colorado, 10 Cir., 143 F.2d 79; Jones v. Gaylord Guernsey Farms, 10 Cir., 128 F.2d 1008; United States v. Stanolind Crude Oil Purchasing Co., 10 Cir., 113 F.2d 194. Regulations so promulgated may be altered or amended to include other objects, property, or service and judicial construction or approval of the original or parent regulation gives way to a subsequent amendment by the administrative agency. Helvering v. Reynolds, 313 U.S. 428, 61 S.Ct. 971, 85 L.Ed. 1438, 134 A.L.R. 1155; American Chicle Co. v. United States, 316 U.S. 450, 62 S.Ct. 1144, 86 L.Ed. 1591; Helvering v. Edison Bros. Stores, 8 Cir., 133 F.2d 575.

▮ C. Under the regulations of 26 Code of Federal Regulations, Cumulative Supplement, Sections 130.21 and 130.22, the test of taxability is whether there is a movement of oil through any pipe line reaching from the wells, flow tanks or settling tanks in the area or field where produced, to the storage tanks, a trunk line, a refinery or to a market, excepting therefrom only movement of oil from the wells to the flow tanks or settling tanks adjacent to the wells. Giving the former decision (Jones v. Continental Oil Company, supra) as much effect as may be permissible since adoption of the new regulations, the movement in the process of stabilization can be considered as falling within an incident of production only through the process of such stabilization. The process is at an end when the oil begins the movement from the plant to the storage tanks, and the movement from the plant to the storage tanks is a movement, which under the regulations, is subject to the tax. It is immaterial that such oil is not acceptable by pipe line carriers because of the desired atmospheric pressure. Its acceptability by the carrier for that reason is not a factor in determining the nature of the taxable movement. Alexander v. Cosden Pipe Line Co., 290 U.S. 484, 54 S.Ct. 292, 78 L.Ed. 452; Dixie Oil Co. v. United States, 5 Cir., 24 F.2d 804; General Crude Oil Co. v. Scofield, D.C.W.D.Tex., 39 F.Supp. 586; Caminol Co., Limited v. United States, D.C.S.D.Cal., 41 F.Supp. 819; Mohawk Petroleum Company v. Lewis, D.C.N.D.Cal., 19 F.Supp. 867; see also Alexander v. Carter Oil Company, 10 Cir., 53 F.2d 964; Motter v. Derby Oil Co., 8 Cir., 16 F.2d 717. By analogy, the movement from the storage tanks to the point where the pumps forced the oil into the trunk line of the pipe line carrier is also a taxable movement. Though either movement is subject to the tax, only one tax may be imposed under the regulations for the movement of oil in a gathering service.

Judgment for the defendant will be entered as of the date of the filing of these findings of fact and conclusions of law, this the 22d day of September, 1948.